STATE of Iowa, Appellee,

v.

Charles STEVENS, Appellant.

No. 63117.

Supreme Court of Iowa.

March 19, 1980.

Frank A. Comito, Jr., and Charles S. Lavorato, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Jeanine Freeman, Asst. Atty. Gen., and Dan L. Johnston, Polk County Atty., for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, REES, UHLENHOPP, and McGIVERIN, JJ.

UHLENHOPP, Justice.

This prosecution for first-degree kidnapping involves the admissibility of state-

ments by the victim of alleged sexual abuse, which were made about an hour after the event. *See* §§ 710.1, 710.2, Code Supp.1977.

The pertinent part of section 710.1 provides:

A person commits kidnapping when he or she either confines a person or removes a person from one place to another, knowing that he or she has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

. . . .

3. The intent to . . . subject the person to a sexual abuse.

Section 710.2 provides in pertinent part:

Kidnapping is kidnapping in the first degree when the person kidnapped . . . is intentionally subjected to . . . sexual abuse.

Kidnapping in the first degree is a class A felony.

Conviction of a class A felony carries life imprisonment without application of deferred sentence, suspended sentence, or reconsideration of sentence and with no parole unless the Governor commutes the sentence to a term of years. § 902.1.

The pertinent part of the definition of sexual abuse in section 709.1 is as follows:

Any sex act between persons is sexual abuse by either of the participants when the act is performed with the other participant in any of the following circumstances:

1. Such act is done by force or against the will of the other. In any case where the consent or acquiescence of the other is procured by threats of violence toward any person, the act is done against the will of the other.

. . . .

Section 709.5 in the chapter on sexual abuse provides:

Under the provisions of this chapter it shall not be necessary to establish physical resistance by a participant in order to establish that an act of sexual abuse was committed by force or against the will of the participant. However, the circumstances surrounding the commission of the act may be considered in determining whether or not the act was done by force or against the will of the other.

The question of the spontaneity of the victim's statements is involved in the appeal, necessitating a review of the evidence. The jury could find the facts as follows.

Sheila, age 17, graduated from North High School in Des Moines, Iowa, in May 1978. In July following, Blue Cross-Blue Shield, a prospective employer, asked her to produce a transcript of her credits from North High. Sheila arranged to pick up the transcript from an employee at the high school.

About 9:30 a. m. on July 11, Sheila left home to walk to North High for the transcript. On her way, defendant Charles Stevens, age 30, pulled up in a car and asked her if she wanted a ride. She declined and walked on.

When Sheila approached the North High drive, defendant pulled up again, got out of the car with a gun, and told her to get in. She testified, "He took me by the arm and made me get in on his side." (Apparently the gun later turned out to be a BB pistol.) When asked on the stand why she did not run, Sheila testified, "I was nervous and I didn't know what to do, and I was just too scared."

Defendant stuck the gun in Sheila's side and drove north on Second Avenue. Later he put the gun under the seat after asking "you won't try to open the door or get out or anything?" Sheila testified she was frightened.

Defendant told Sheila to unzip his pants and hold his penis, which she did. He drove to an isolated area, where he stopped. At the subsequent trial, Sheila testified for the State and stated:

Q. What happened when you stopped? A. He told to take all my clothes off.

Q. Did you do that? A. Yes. I started real slow, and then he said, "You want me to do it for you," he goes [*sic*], "because I'll rip them."

Q. So what did you say? A. I just said, "no," and—

Q. Did you take your clothes off? A. Yes.

Defendant fondled Sheila's breasts and placed his hand by her sexual parts. Sheila testified that defendant "made me do oral sex." He then drove to another isolated area. Sheila testified further that she had tears in her eyes but was "too scared to really cry," and that defendant made her get out of the car and lie on the grass on her dress. He told her to perform oral sex on him again, which she did, and he then had intercourse with her.

Another car began to approach. Defendant told Sheila to dress. They then got in the car, where defendant told Sheila that if she had accepted his first offer of a ride he would have taken her where she wanted to go and "wouldn't have done that." He took Sheila's money (amounting to about $2.50), threatened to blow her head off if she told the police what had happened, drove her to a point about a block and a half from North High, and let her out.

Sheila walked to North High, entered the office, and asked to use the telephone. She called the home of a friend, Diedre, who was away at the time. She talked with a small child who answered and then with Diedre's mother, asking her to have Diedre drive to North High when she came home. Sheila then talked to the employee at North High, obtained the transcript, and waited for Diedre. She did not call her mother, who was working at a new job; Sheila did not know the telephone number there. She testified she did not call the police because she was scared and wanted to talk to her mother.

Diedre arrived in about a half hour. Sheila testified at trial without objection:

Q. When Diedre picked you up did you tell her what happened? A. Well, at first I just kind of cried, and she just said, "What happened?" And I just said, "The most awful thing." And I just said, "I was raped."

The two girls drove to a church day center where Sheila had formerly worked. The director there called the police, and Sheila reported the incident.

Diedre also testified at the trial on behalf of the State. The following record on her direct examination constitutes the basis for defendant's appeal:

Q. How would you describe [Sheila] when you first ran into her? A. Well, when I got in the parking lot I seen her. She started walking out to the car and she looked really white, and I thought she must have been sick.

Q. And what did she say?

Mr. Comito [defense counsel]: Your Honor, I am going to object to this as hearsay at this point as to what Sheila said to her.

The Court: Overruled. She may answer.

Q. What did she say to you? A. She got in the car, and I asked her what happened, what was the matter. And she said that the most awful thing had happened. And I asked her again, and she said she'd been raped. And she started crying a lot. And she got hysterical.

Further:

Q. And briefly what did she tell you about what had happened?

Mr. Comito: Your Honor, again same objection that this is hearsay.

The Court: You may have a standing objection. The Court feels it is part of the res gestae and is overruling your hearsay objection.

Mr. Comito: Thank you, Your Honor.

Q. Continue. A. Well, she said she was walking to the school to get her grades for the job interview and this car pulled up and asked her—this guy asked her if she wanted a ride, and she said no. And then she was walking through the parking lot of North High and he pulled in and had a gun and he told her that if she'd have got in the car the first time that he might have taken her where she wanted to go.

Q. What else did she tell you? A. Well, he told her to get into the car. And so I guess she got in on his side, because

she told me that her—the driver—the passenger side, the door was locked, and he had the gun in her side.

Q. Did she tell you where he took her? A. Yes, but I don't remember for sure.

Q. Did she tell you what happened? A. Yes.

Q. What did she tell you had happened to her? A. Well, it was between the parking lot, where I took her—

The State then abruptly turned the examination to other matters.

After defendant's arrest the county attorney charged defendant with first-degree kidnapping based on his taking Sheila to the place of the act without her consent with the intent to subject her to sexual abuse, and on intentionally subjecting her to such abuse. Defendant moved before trial to suppress Diedre's testimony regarding Sheila's statements following the incident. The court deferred ruling until trial. At trial the court admitted the statements over objection, as we have related. A jury found defendant guilty, the court sentenced him to life imprisonment, and he appealed. In his appeal he contends that Diedre's testimony regarding Sheila's description of events was erroneously admitted into evidence.

I. At the outset we observe that the State predicates first-degree kidnapping on abducting with intent to commit sexual abuse and on committing the abuse. The claimed sexual abuse the State relies on would formerly have been called forcible rape. Cf. State v. Steltzer, 228 N.W.2d 557 (Iowa 1980) (similar case under present statutes); State v. Knutson, 220 N.W.2d 575, 577 (Iowa 1974) (similar case under prior statutes). We believe, therefore, that our decisions which deal with utterances of rape victims are pertinent, including a decision which deals in some detail with that subject, State v. Grady, 183 N.W.2d 707 (Iowa 1971).

II. We are not concerned here with testimony in response to impeachment or with a defendant who himself brings out details of a complaint by the victim. The State introduced this testimony as part of its case in chief.

■ The objection defendant interposed was that the testimony constituted hearsay. Hearsay consists of extra-judicial statements offered in evidence to prove the truth of what was said. State v. Horn, 282 N.W.2d 717, 724 (Iowa 1979).

■ In Grady we pointed out that statements of an alleged rape victim may be of two kinds; one kind is not hearsay at all, while the other kind is hearsay but may nonetheless be admissible.

The first kind of statement, which can occur only if the alleged victim testifies to the commission of the act, consists of the victim's complaints of the mistreatment. We stated in Grady, 183 N.W.2d at 713:

> Assertions by testifying witnesses as to the fact of complaint uttered to them by the prosecutrix are admissible in this type of case when offered as corroboration of the prosecuting witness. The purpose of such offer of evidence is not to show the truth of the matter asserted in the utterance, but only that a complaint was uttered by the woman. The hearsay rule is not involved.

We also pointed out that this kind of statement is limited in scope, saying at page 716:

> We conclude the proper rule to be followed requires that where complainant in a rape case is a witness and her credibility has not been impeached in any respect, her testimony that she made complaint and to whom as well as the testimony of those witnesses to whom such complaint has been uttered is to be limited to the fact of complaint including, of course, so much of the complaint as identifies "the time and place with that of the one charged" or in other words, so much as will identify the occurrence complained of with the crime charged. Any further terms of her utterance are not only immaterial for the purpose of corroboration, but practically turn the statement into a hearsay assertion and as such is inadmissible except as a spontaneous declaration. See 4 Wigmore on Evidence, Third Ed., section 1138. Thus, unless such assertions

can qualify for admissibility as the injured female's spontaneous exclamations, details of the incident are not permitted. Further, at page 718:

> The provision in the rule announced supra permitting "so much of the complaint as identifies the time and place with that with the one charged," is not to be extended to permit testimony on direct examination of the fact the female in making complaint identified the accused.

Lapse of time is not a strict requirement to admissibility of this kind of statement, although the statement may be so long delayed as to be inadmissible. *Id.* at 714.

■ The other kind of statement of a victim is the excited utterance (sometimes called spontaneous declaration, res gestae, or expressions of similar import). *Id.* at 716. These statements must meet a requirement of spontaneity in order to possess a circumstantial guarantee of trustworthiness for admissibility. *McCormick's Handbook of the Law of Evidence* § 297, at 704 (2d ed. E. Cleary 1972); 6 J. Wigmore, *Evidence* § 1768, at 257 (Chadbourn rev. 1976). This exception to the hearsay rule applies generally in criminal prosecutions when the statement is made under the influence of the excitement of the incident rather than on reflection or deliberation. Illustrative is our recent case holding statements to an officer to be admissible, *State v. O'Connell*, 275 N.W.2d 197, 201–02 (Iowa 1979). We there stated:

> [D]efendant made a hearsay objection only when officer Gary McCormack·was relating circumstances surrounding the first assault. This witness testified he and a fellow officer had responded promptly to a call at the O'Connell mobile home. When they arrived Carole was sobbing, her eyes were red, her cheeks were wet, and the left upper portion of her lip was swollen. A tooth had been chipped and she had some particles of tooth in a little handkerchief or kleenex held in her hand. Over the hearsay objection officer McCormack was permitted to testify Carole "said that her husband had hit her real hard in the back of the head and that he had struck her two or three times in the face and that he knew quite a bit about karate."

III. We may divide the questioned testimony of Diedre into two parts: the part in which Sheila simply told Diedre "she'd been raped," and the part in which Sheila narrated to Diedre that she had walked to school for her grades; that this man pulled up and asked her if she wanted a ride which she declined; that she walked through the parking lot, and the man pulled in with a gun and told her if she had gotten in the first time he might have taken her where she wanted to go; that he told her to get in; that the door on the passenger side was locked; and that he had a gun in her side, and also in which she told Diedre where he took her and what happened there.

■ We have no difficulty at all with the first part, Diedre's testimony of Sheila's complaint itself. Sheila herself testified to that statement to Diedre and defendant did not object, evidently concluding an objection would be useless under *Grady*. Defendant was right, and for the same reason the objection to Diedre's testimony regarding Sheila's complaint was without merit.

The second part of Diedre's testimony regarding Sheila's statements, however, poses a difficult question. The State is right in claiming this court's rationale has been that trial courts have discretion in determining the spontaneity question and that the trend has been toward liberality in the admission of this class of testimony. *See, e. g., State v. Swanson*, 228 N.W.2d 101, 104 (Iowa 1975). On the other hand, numerous cases here and elsewhere state that a narration in which the declarant recounts the details of a past event does not ordinarily qualify as a spontaneous utterance. Illustrative are *State v. Kidd*, 239 N.W.2d 860, 865 (Iowa 1976); *State v. Warren*, 242 Iowa 1176, 1184, 47 N.W.2d 221, 225–26 (1961); *Vincent, Albin & Strahl v. Hines*, 198 Iowa 1224, 1233, 200 N.W. 1, 5 (1924); *Budde v. National Travelers' Benefit Association*, 184 Iowa 1219, 1232, 169 N.W. 766, 771 (1918). *See also*, 29 Am.Jur.2d *Evidence* § 717, at

781–83 (1967); 31A C.J.S. *Evidence* § 420, at 1036–38 (1964). Unquestionably Sheila's statements constituted a narration.

■ We have examined the authorities closely and conclude the reason for their pronouncements that narrations are ordinarily inadmissible does not lie in the narrative character per se, rather it lies in the effect the narrative nature of the statement ordinarily has in the determination of the spontaneity issue. Before the statement can be admitted as an exception to the rule excluding hearsay, the court must be persuaded that the utterance was impulsive, not reflective. The fact of narration of the particulars itself weighs in the balance against impulsiveness. *Compare* 6 J. Wigmore, *Evidence* § 1756, at 232 (Chadbourn rev. 1976), *with* 2 S. Gard, *Jones on Evidence* § 10.4 (6th ed. 1972).

■ We are satisfied from the record that Sheila was still very upset from her traumatic experience when she talked to Diedre. She entered the car with her friend Diedre and, very naturally, told what happened. Not much time had yet elapsed from the occurrence. *See Annot.*, 89 A.L. R.3d 102 (1979) (collecting cases on time element). While her statements were not limited to an exclamation, neither were they protracted. The trial court evidently believed they were the product of impulse at the time, rather than reflection.

We have scrutinized the res gestae statements in a number of our decisions. Several of them are *O'Connell*, 275 N.W.2d at 202 (person assaulted told officer "that her husband had hit her real hard in the back of the head and that he struck her two or three times in the face and that he knew quite a bit about karate"—admissible); *State v. Haines*, 259 N.W.2d 806, 809–10 (Iowa 1977) (victim told mother the defendant had put finger in her vagina and anus and hurt her—admissible); *State v. Terrill*, 241 N.W.2d 16, 18–19 (Iowa 1976) (victim identified assailant to aunt as the person who had previously run her sister home—admissible); *Swanson*, 228 N.W.2d at 104 (victim identified assailant to police as the defendant—admissible). *See also, State v.*

*Paulsen*, 265 N.W.2d 581, 586 (Iowa 1978); *State v. Watson*, 242 N.W.2d 702, 704 (Iowa 1976).

Upon consideration of the question of spontaneity in the light of the record and the rationale of our cases, we are unwilling to say that the trial court abused its discretion in admitting Diedre's testimony.

We hold, therefore, that the conviction should stand.

AFFIRMED.